**Richard Eugene HARRIS, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

No. F-77-771.

Court of Criminal Appeals of Oklahoma.

March 2, 1979.

Larry Derryberry, Atty. Gen., Givens L. Adams, Asst. Atty. Gen., for appellee.

James E. Frasier, Tulsa, for appellant.

OPINION

CORNISH, Presiding Judge:

Richard Eugene Harris has appealed his conviction of Murder in the Second Degree in the District Court, Tulsa County. His sole assignment of error is that the evidence presented by the State was not sufficient to establish a prima facie case. After a care-

ful review of the evidence, however, we believe that the evidence was sufficient to submit to the jury.

On June 12, 1975, Paul Thomas Shead arrived at his residence in Tulsa at approximately 6:30 p. m. He sat down to dinner with his parents, who reside at the same address. After eating, he began watching a television program but was soon interrupted by a telephone call. He conversed for a few minutes and then resumed watching television. When the program ended at 8:00 p. m., Mr. Shead left to take his dog for a walk in Mohawk Park, which was about five miles away. He was barefoot and was wearing blue-and-white-striped cutoff shorts and a brown T-shirt when he drove away in his 1975 Datsun B210.

Bob Gene Young occasionally went to Mohawk Park in the evening to enjoy a cool beer while his wife shopped. He was so engaged when he encountered Paul Shead and his dog at approximately 8:30 p. m. that evening. Mr. Young had become somewhat acquainted with Mr. Shead because he often saw him in the park with his dog. On this particular evening, Mr. Shead remained seated in his car as he and Young entered into a brief conversation. Mr. Young then left in order to pick up his wife by 9:00 p. m. He said that Mr. Shead "really never met a stranger," in that he would visit or attempt to get acquainted with almost anyone he met in the park. On cross-examination, Mr. Young stated that he had never been propositioned by Mr. Shead and that he did not know if Shead propositioned others in the park. He also said that he knew Richard Maurice Johnson and that he had seen Mr. Shead and Mr. Johnson together.

At approximately 1:00 a. m. on the morning of June 13, 1975, Officer G. T. McFadden of the Tulsa Police Department discovered a brown Datsun which had gone off the road into a ditch in the eastern portion of Mohawk Park. When he approached the car, he saw a white male in his late twenties in the driver's seat with his head propped against the doorpost and his mouth gaping open. The man was wearing a brown T-shirt which had a small red stain on the left portion of the chest. Officer McFadden noticed that the light switch was pulled out and that the car's battery was dead. The officer checked the occupant of the car for a pulse, but found none. He testified that the deceased's left foot was on the clutch, that the vehicle was in gear, and that the keys were in the ignition and turned to the "on" position. There was a pair of undershorts on the floor between the feet of the victim. Skidmarks on the road tracked right in behind the vehicle. Officer McFadden radioed for a detective from the Identification Division.

Carl Gene Akins, a detective for the Tulsa Police Department, was assigned, at 1:10 a. m. on June 13, to investigate the homicide at Mohawk Park. When he arrived at the scene, he met Officer McFadden and two security officers, who took care of the dog that was inside the car. Akins took measurements of the scene and was so engaged when Investigator Brown arrived. Brown dusted the car for fingerprints and took photographs of the scene. He and Akins then began to inspect the interior of the car. They discovered a billfold lying on the front floorboard on the passenger side, which contained items of identification bearing the name of Richard E. Harris, and a Radio Shack receipt with Paul Shead's name and address on it. At approximately 4:00 a. m., Akins assisted in the removal of the body from the automobile. He observed a bullet hole in the left chest with a spot of blood around the hole, approximately the size of a 50 cent piece. There was no exit wound. The body was stiff when removed, and when the officers attempted to put the body into a semiprone position, blood began gushing out of the wound. The arms and legs were cold to the touch and stiff. The body was clothed in blue-and-white-striped cutoff shorts and a brown polo shirt.

Akins followed the body to the Hillcrest emergency room, where Mr. Edmond Shead, the victim's father, identified the deceased as his son.

At trial, Mr. Shead identified the yellow Radio Shack receipt as one which was probably given to his son when he purchased an eight-track tape eraser. He said that his son had a billfold, but that it was not the one found in the automobile: The victim's billfold was dark, smooth and considerably thicker. He also stated that his son usually kept $100.00 to $300.00 in his billfold and may have been carrying more than that because they had been planning to go on vacation. He further testified that Paul Shead always had to carry a pocketbook because he had to have his driver's license, but that he had not seen his son's billfold on the night of the murder, or since, and that he did not know what had happened to it.

At 9:15 a. m. on June 13, 1975, Dr. Leo Lowbeer, Chief Pathologist of Hillcrest Medical Center, performed an autopsy upon the body of Paul Thomas Shead. His external examination revealed that there were no undershorts, no shoes, and no stockings on the victim, and that rigor mortis had completely developed except in the neck muscles. A bullet was located within the body and removed. Dr. Lowbeer found the trajectory of the projectile remarkable in that the bullet travelled downward from right to left and from front to back. The bullet, which entered the chest just left of the midline, perforated the second rib on the left side, both lobes of the left lung, the left diaphragm, the spleen, the diaphragm again—below the spleen, and then the 10th rib on the left side. The cause of death was bleeding from the perforation of the blood vessels of the left lung. Although the amount of blood discovered during the autopsy was massive, the perforation was small, indicating that it would have taken some time for death by bleeding to have occurred. Dr. Lowbeer concluded that the victim could have easily lived for 30 minutes after receiving the gunshot wound and that he would have been capable of driving a car during that interval.

The victim's stomach contained a fair amount of moderately digested food, indicating that the victim had eaten approximately two to three hours prior to death. Dr. Lowbeer placed the time of death between 9:00 and 10:00 p. m., and indicated that this opinion would be consistent with the fact that the deceased had last been seen alive at about 8:30 to 9:00 p. m. on June 12.

Thomas Dean Jordan, a firearms and toolmark examiner for the Oklahoma State Bureau of Investigation, was asked to determine the caliber of the projectile removed from the body of Paul Shead and to make a determination as to the type of weapon from which the projectile was fired. He was also given the shirt which had been removed from the body of the deceased, requested to examine it for gunpowder residue, and to determine how far from the victim the murder weapon had been when it had been fired.

His examination revealed that the bullet measured .357 of an inch, indicating that it was a .38 caliber projectile. An examination of the class characteristics, the lands and grooves, as well as the direction of the twist, established that the projectile had six lands and grooves and a left-hand twist, characteristic of a Colt revolver. Mr. Jordan testified that to his knowledge Colt was the only manufacturer producing a .38 caliber weapon with a left-hand twist.

The witness stated that he had also conducted a Greiss examination upon the shirt. This test consists of covering the fabric with sulfanilic acid and alphanaphthalamine, using acetic acid as a transfer agent. By this method the residue left on the shirt was transferred onto photo paper, giving a density and a diameter pattern. Then the examiner attempts by trial and error to duplicate the original density and diameter pattern. From this, a determination may be made as to the distance from the weapon to the fabric when the weapon was discharged.

In this particular case, the test was conducted with a .38 caliber Colt diamondback six-shot revolver with a four-inch barrel, as requested by the District Attorney. Mr. Jordan found that the test weapon duplicated the density and diameter pattern found on the deceased's shirt when discharged from a distance of 12 to 48 inches.

On cross-examination, Mr. Jordan testified that both a .357 and a .38 weapon

are .38 caliber and that a .38 projectile could be fired from a .357 magnum weapon, but that a .357 magnum shell could not be fired from a .38 weapon. He also said that the results of the Greiss examination would vary with the type of ammunition used and the length of the barrel of the test weapon.

At 4:30 p. m. on June 12, 1975, Robert Dewayne Gifford, Ray Ward and the defendant were working together on a construction job in Tulsa, Oklahoma. After work that day the three men went to the Circle Plaza Bar, at 51st Street and Peoria, about one block from the construction site. Mr. Gifford testified that he had several beers and was intoxicated when the three men left the bar somewhere between 9:00 p. m. and 9:15 p. m. that evening. He stated that the defendant had bought all the beer that night. He also said that it usually took about 40 minutes to drive from the construction site to his home in Mannford, and that on this particular night he arrived home before the 10:00 p. m. news. Shortly after 8:00 a. m., on June 13, Mr. Gifford talked with the defendant at the job site. He recalled that the defendant claimed to have left his billfold at the Circle Plaza Bar the night before. After hearing this, Mr. Gifford promised to call the bar and ask whether the wallet was still there, when the bar opened. As foreman, he was permitted to make phone calls, whereas the defendant, who worked under Mr. Gifford, could not call for himself. However, Gifford never made the call because the defendant was arrested before the bar opened.

Ray Ward's testimony generally corroborated that of Gifford's. However, he elaborated somewhat as to the amount of beer consumed. He said that he had had in excess of six bottles of beer, agreeing that the defendant had paid for all of it. In addition, he recalled that on one occasion he had seen a .38 caliber Colt with a ribbed barrel in the defendant's car. On a different occasion, he had noticed a .38 caliber Smith and Wesson in the defendant's car. Both these instances occurred before June 12, 1975, although the witness was unable to pin down the date with any degree of certainty.

Mark Williams was employed by Target Stores, Inc., as department manager of the Sporting Goods Department. He testified that on May 16, Maxine Harris purchased a Colt diamondback .38 Special revolver and that at that time she filled out a City of Tulsa application for purchase of a dangerous weapon. He recalled that sale with particularity, because the gun sold to Ms. Harris was a rare model. At trial, Mr. Williams was at first unable to identify the purchaser of the gun from those present in the courtroom. However, when the defendant's wife was brought into the room he immediately pointed to her as the person who had bought the gun.

The defendant was arrested at the job site shortly after 9:00 a. m. on June 13, 1975, by Officer Bill McCracken of the Tulsa Police Department. He located the defendant and asked him to walk to the police car. The defendant was then seated in the rear seat of the two-door vehicle, and Officer McCracken sat in the front seat.

Officer McCracken first requested that the defendant produce his identification, and when the defendant told him that his billfold had been lost in a bar the night before, the officer advised him of his rights. The defendant then agreed to talk to Officer McCracken and to the other officers who had accompanied him. The defendant stated that after work on the previous day he had gone to a bar with two men with whom he worked. He had discovered that his wallet was missing when he arrived home that night. The defendant at first said that he had not told anyone about the wallet at that time. Later in his conversation with the officers, however, he changed his story. He said that he had told his wife of the missing wallet and that they had started to go to the bar to retrieve it, but had changed their minds about going to the bar. Officer McCracken then inquired as to whether the defendant owned any guns. The defendant replied that he owned two guns, a .38 Smith and Wesson and a .38 Colt. However, he also related that his wife had lost the Colt at Tenkiller Lake the previous weekend. The defendant then gave the officers verbal permission to

search his automobile, which they did. Afterwards, the defendant agreed to make a statement, and he was transported downtown to the police station where a statement was taken.

The officer testified, upon cross-examination, that he had periodically worked on this case from June 13, 1975, until September of 1976, when he left the police department. He also stated that he did not feel that this matter had been worked out until the case was filed, and that it had been filed sometime after he had left the department.

At the conclusion of Officer McCracken's testimony, the State rested, and the defendant entered a demurrer to the State's evidence, more properly termed a motion for a directed verdict. See, 22 O.S.1971, § 850. When that motion was overruled, the defendant called Tom Lewallen to testify.

Officer Lewallen of the Tulsa Police Department had been presented as an expert in firearms identification at the preliminary hearing. The defense wished to call him as a defense witness at trial, but since he was unavailable to testify, the State consented to the introduction of his prior testimony. This testimony was largely consistent with that of Mr. Jordan but Officer Lewallen differed in his opinion as to the number of manufacturers who make a .38 caliber weapon with six lands and grooves and a left-hand twist. He stated that six or eight companies manufacture such a weapon, but that the Colt is the most popular. He said that he did not know the names of the other companies, but that they imported weapons into this country. He further stated that they were mostly companies which sold very few arms in the United States. However, he also said that there were many of the weapons around.

The defendant cites a number of cases for general propositions relating to the sufficiency of the evidence. He asserts that where the State relies entirely upon circumstantial evidence, the facts and circumstances must not only be consistent with—and point toward—the guilt of the defendant, they must also be inconsistent with his innocence. He also argues that proof which amounts only to a suspicion, or a mere probability, is not sufficient to put before the jury, and that the circumstances relied upon by the State must exclude every reasonable hypothesis except that of guilt.

These statements are all true. See, for instance, *Klinekole v. State*, Okl. Cr., 456 P.2d 623 (1969); *Speegle v. State*, Okl.Cr., 556 P.2d 1045 (1976); and, *Johnson v. State*, Okl.Cr., 564 P.2d 664 (1977). Nevertheless, the question of the sufficiency of evidence must in every case rest ultimately on the facts of the case: Do they or do they not establish a prima facie case. If the State has presented a prima facie case, then all remaining fact questions are for the jury to decide, and not the trial court or this Court.

In the instant case the facts are admittedly weak, but we believe that a prima facie case was established on the evidence summarized above. For that reason, the judgment and sentence from which the defendant appeals is AFFIRMED.

BRETT and BUSSEY, JJ., concur.